```
                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                     FORT MYERS DIVISION
```

FLORIDA PANTHERS, (Puma concolor coryi) an endangered species, RED-COCKADED WOODPECKERS, (Picoides boralis) an endangered species, FLORIDA WILDLIFE FEDERATION, a not-for-profit Florida corporation, and COLLIER COUNTY AUDUBON SOCIETY, INC., a not-for-profit Florida corporation,

      Plaintiffs,

v.

Case No: 2:13-cv-612-FtM-29DNF

COLLIER COUNTY, FLORIDA, a political subdivision of the State of Florida, GEORGIA A. HILLER, in her official capacity as a Collier County Commissioner, TOM HENNING, in his official capacity as a Collier County Commissioner, FRED W. COYLE, in his official capacity as a Collier County Commissioner, and TIM NANCE, in his official capacity as Collier County Commissioner,

      Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on defendants' Motion to Dismiss First Amended Complaint (Doc. #22) filed on December 13, 2013. Plaintiffs filed a Response in Opposition (Doc. #23) on

December 26, 2013.  For the reasons set forth below, the motion is granted.

**I.**

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted).  To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level." Id. at 555. See also Edwards v. Prime Inc., 602 F.3d 1276, 1291 (11th Cir. 2010).  This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, Erickson v. Pardus, 551 U.S. 89 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth," Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted).  "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) (internal quotation marks and citations omitted). Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

## II.

On August 21, 2013, the Florida panthers, the red-cockaded woodpeckers, the Florida Wildlife Federation (FWF), and the Collier County Audubon Society (CCAS) (collectively, plaintiffs) initiated this action against Collier County, Florida and Collier County Commissioners Georgia A. Hiller, Tom Henning, Fred W. Coyle, and Tim Nance (collectively, defendants) pursuant to the Endangered Species Act of 1973 (ESA), 16 U.S.C. § 1531-1544. Plaintiffs' First Amended Complaint, filed on December 12, 2013, seeks declaratory and injunctive relief to prevent defendants from implementing, enacting, or authorizing land clearing, land uses, and road extensions into occupied and essential habitats of Florida panthers and red-cockaded woodpeckers in North Belle Meade without

an ESA Section 10 Habitat Conservation Plan (HCP) and incidental take permit (ITP) from the U.S. Fish and Wildlife Service (FWS).

Before summarizing the factual allegations in the First Amended Complaint, the Court will provide an overview of the ESA.

**A.   The Endangered Species Act of 1973**

Congress enacted the Endangered Species Act of 1973, 16 U.S.C. § 1531-1544, "to halt and reverse the trend toward species extinction, whatever the cost." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978). "In accordance with this policy, the ESA provides for the listing of species as threatened or endangered and the designation of their critical habitat." Defenders of Wildlife v. United States Dep't of the Navy, 733 F.3d 1106, 1111 (11th Cir. 2013) (citing 16 U.S.C. § 1533). Section 9 of the ESA protects the threatened and endangered species listed pursuant to § 1533 by making it unlawful for any person subject to the jurisdiction of the United States to "take" any such species. 16 U.S.C. § 1538(a)(1)(B).

Defined broadly, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19); see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 704 (1995) ("Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions."). The term "harass" is

further defined by the regulations as an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The regulations define "harm" as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

Congress provided an incidental take permit exception to § 1538(a)(1)(B) for takings that are incidental to, and not the purpose of, the execution of an otherwise lawful activity. 16 U.S.C. § 1539(a)(1)(B). As a prerequisite to receiving an incidental take permit, the applicant must submit a habitat conservation plan that specifies:

    (i) the impact which will likely result from such taking;

    (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;

    (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and

    (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.

16 U.S.C. § 1539(2)(A)(i)-(iv).

**B.   Endangered Species under the ESA**

With this overview in mind, the Court will now turn to the allegations in the First Amended Complaint.

**(1)   The Florida Panther**

The Florida panther has been listed by the FWS as an endangered species since 1967.  The Florida Fish and Wildlife Conservation Commission (FWCC) estimates that the current population of Florida panther adults is approximately 100-160, making the Florida panthers one of the most endangered species in the United States.  The current breeding population of Florida panthers is located on approximately 2.27 million acres in Collier, Lee, Hendry, Miami-Dade, and Monroe counties.  The North Belle Meade (NBM) area in Collier County has been designated as primary zone Florida panther habitat and the presence of collared and uncollared Florida panthers in NBM has been well documented for decades.

The FWS's Recovery Plan for the Florida panther requires the protection of all existing occupied breeding panther lands, expansion of the panther breeding population to 250 adults, and the reintroduction of at least two additional breeding populations of 250 adult Florida panthers within the Florida panthers' historic range of outside south-central Florida.  In order to protect the

current population of Florida panthers, habitat conservation measures must be used to protect occupied primary zone Florida panther habitat, such as NBM, from being cleared, mined, or fragmented by roadways.

### (2) The Red-cockaded Woodpecker

The red-cockaded woodpecker has been listed by the FWS as an endangered species under the ESA since 1970. Both the FWS and the FWCC have identified colonies of red-cockaded woodpeckers in west and central NBM, and the FWCC has identified the lands in NBM to be strategic habitat for the red-cockaded woodpecker. The only documented occurrence of red-cockaded woodpeckers on private land in Collier County is in NBM.

The primary threats to the red-cockaded woodpecker are habitat loss, fragmentation by land clearing and roadways, habitat degradation, and isolation. Highways fragment red-cockaded woodpecker populations in three ways: loss of large carnivores, habitat dissection, and the isolation of red-cockaded woodpeckers. When highways fragment large carnivore populations, red-cockaded woodpeckers can suffer increased depredation from smaller carnivores such as bobcats, skunks, and weasels. Habitat dissection and isolation often result in patches of habitat too small to function as red-cockaded woodpecker territory.

The FWS developed a recovery plan for red-cockaded woodpeckers, which requires: (1) the location and preservation of viable pine forested habitats; (2) restoration of degraded pine forests; and (3) maintaining or creating pine forested wildlife corridors which link or have the opportunity to link potential breeding groups of red-cockaded woodpeckers.

Between 2007 and 2009, Collier County's "Habitat Conservation Plan Committee" drafted an ESA Section 10 HCP for the protection and conservation of red-cockaded woodpeckers in NBM. The drafted plan clearly identified the red-cockaded woodpecker cavity trees and foraging areas in NBM, and contained maps of FWCC telemetry locations of collared Florida panthers up to 2009. The Collier County Board of Commissioners, however, voted against the approval of the Habitat Conservation Plan in 2009.

**C.   The Collier County Comprehensive Land Use Plan**

In 1989, Collier County enacted its first comprehensive land use plan, the Collier County Comprehensive Land Use Plan (the Collier Plan). During the adoption process of the Collier Plan, an advisory group of wildlife experts designated areas in Collier County that needed to be given additional protections in the Collier Plan as Natural Resource Protection Areas (NPRAs). The Collier Plan provided that NPRAs would be designated on the Future

Land Use Map of the Collier Plan by August 1994 in order to protect endangered species and their habitats within Collier County.

On November 14, 1997, Collier County amended the Collier Plan pursuant to the County's 1996 Evaluation and Appraisal Report (EAR). Among the amendments was the deletion of the August 1994 deadline for designating NPRAs on the Collier Plan's Future Land Use Map. On December 24, 1997, the Florida Department of Community Affairs (FDCA) issued a Notice of Intent to find Collier County's EAR-based amendments not "in compliance," as defined by Fla. Stat. § 163.3184(1)(b). The FDCA's petition was forwarded to the Florida Division of Administrative Hearings and the FWF and CCAS intervened in the action. After a five day evidentiary hearing, the Administrative Law Judge (ALJ) issued a Recommended Order finding that Collier County's EAR-based amendments were not in compliance with Chapter 163, Part II, Florida Statutes.

The Recommended Order was approved by the Florida Administration Commission on June 22, 1999, and a Final Order was entered directing Collier County to take the following steps to bring the Collier Plan into compliance with Chapter 163: (1) rescind the 1997 EAR-based amendments that were not in compliance with Chapter 163; (2) adopt certain specific "remedial" amendments; (3) initiate a three year assessment of the area of Collier County designated on the Future Land Use Map as

Agricultural/Rural; (4) adopt interim amendments to remain in force during the three year assessment; and (5) no later than June 22, 2002, adopt plan amendments needed to implement the findings and results of the three year assessment. Collier County was also required to direct incompatible land uses away from wetlands and upland habitats of listed species by means of creative planning techniques.

Collier County conducted the three year assessment as directed and elected to divide the Agricultural/Rural designated areas into two sub districts-the Rural Fringe and the Eastern Lands. The Eastern Lands, consisting of 196,000 acres surrounding Immokalee, was designated the Rural Lands Stewardship Area. The Rural Fringe, consisting of 93,000 acres, including the 15,552 acre NBM area, was designated the Rural Fringe Mixed Use District.

In 2002, Collier County enacted Collier County Ordinance No. 02-32 to amend the Collier Plan. The amendments included the 2002 Coastal and Conservation Management Element (CCME) Objective 7.1. The CCME mandated that the County "direct incompatible land uses away from listed species and their habitats" based upon the listing process of state and federal agencies. Pursuant to this directive, the following land use designations were set forth in the Future Land Use Element of the Collier Plan: (1) the "Conservation" land use category; (2) the "Big Cypress Area of

Critical State Concern Overlay" land use category; (3) the "NRPA" land use category; (4) the "Sending Lands" land use category with transfer of development rights to "Receiving Lands"; and (5) the "Habitat Stewardship Areas" land use category applicable to the Rural Lands Stewardship Area of the Collier Plan.

The Rural Fringe Amendments defined "Sending Lands" as those "[t]hat have the highest degree of environmental value" and "are the principal target for preservation and conservation." Residential use of "Sending Lands" under the Collier Plan is limited to one dwelling unit per parcel which existed as of June 22, 1999, or one dwelling unit per 40 acres. Non-residential uses other than agriculture are limited for the purpose of protecting native habitat, wildlife, wildlife habitat, and wetlands. Mining is prohibited on lands designated as "Sending Lands." The Rural Fringe Amendments designated the HHH Ranch property as "Sending Lands," which limited residential density onsite, provided for the transfer of development rights to designated "Receiving Lands," and prohibited mining on the property.

The owners of the HHH Ranch, Dr. Francis Hussey and Mary Pat Hussey, challenged the designation of their property as "Sending Lands" in an administrative hearing. After an eight day evidentiary hearing, the presiding ALJ issued a Recommended Order finding the Rural Fringe Amendments to be in compliance with

Chapter 163, Part II, Florida Statutes, because the designation of the Hussey's land as "Sending Lands" was based upon the best available evidence. The Husseys filed exceptions to the Recommended Order with the FDCA. The FDCA entered a Final Order upholding the designation of the Hussey's property as "Sending Lands." The Husseys appealed the FDCA's Final Order and Florida's First District Court of Appeals affirmed the decision.

The Husseys filed another lawsuit challenging the designation of the HHH Ranch property pursuant to the Bert J. Harris, Jr., Private Property Rights Protection Act, Fla. Stat, § 70.001, in the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida. On February 12, 2013, defendants authorized a Settlement Agreement with the Husseys to: (a) amend the Collier Plan designation of 578 acres of occupied Florida panther and red-cockaded woodpecker habitat on the HHH Ranch from "Sending Lands" to "Receiving Lands"; (b) extend Wilson Boulevard into occupied Florida panther and red-cockaded woodpecker habitat; and (c) reduce land clearing restriction on 578 acres of the HHH Ranch. A "Joint Motion for Court Approval of Settlement Agreement, Pursuant to Florida Statutes 70.001(4)(d)(2)," was filed with the Circuit Court on April 26, 2013, and the FWF and CCAS, as intervenors in the action, filed a response to the motion. On September 13, 2013, Circuit Judge Cynthia A. Pivacek, in denying

the Joint Motion for Court Approval of Settlement Agreement, concluded that the Settlement Agreement would contravene the application of laws and regulations, including the ESA, and would not protect the public interests served by such laws and regulations. (Doc. #17-3, p. 17.) Both the County and the Husseys appealed the Order Denying Approval of Joint Settlement Agreement to Florida's Second Circuit Court of Appeals, which appeal remains pending.

Plaintiffs allege that defendants have violated the ESA by (1) authorizing and allowing the HHH Ranch to perform agricultural land clearing on 604 acres of occupied Florida panther and red-cockaded woodpecker habitat, and (2) authorizing the Settlement Agreement with the Husseys to (a) amend the Collier Plan designation of 578 acres of occupied Florida panther and red-cockaded woodpecker habitat on the HHH Ranch from "Sending Lands" to "Receiving Lands"; (b) extend Wilson Boulevard into occupied Florida panther and red-cockaded woodpecker habitat; and (c) reduce land clearing restriction on 578 acres of the HHH Ranch. Plaintiffs assert that defendants' actions, individually and cumulatively, violate the ESA because they are causally related to the "take" of Florida panthers and red-cockaded woodpeckers, for which defendants did not obtain a Section 10 HCP or an ITP from the FWS.

**III.**

Defendants move to dismiss the claim relating to the proposed Settlement Agreement between Collier County and the Husseys for lack of subject matter jurisdiction because it presents a hypothetical, rather than "actual," legal dispute.[1]

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" Gunn v. Minton, 133 S. Ct. 1059, 1064 (2013) (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)). "Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' which restricts the authority of federal courts to resolving the legal rights of litigants in actual controversies." Genesis Healthcare Corp. v. Symczyk, 133 S. Ct. 1523, 1528 (2013) (citation and internal quotation marks omitted). "This case-or-controversy doctrine fundamentally limits the power of federal courts in our

---

[1] Defendants also assert that any claims relating to the Wilson Boulevard Extension are not ripe for judicial review. Plaintiffs, however, have presented evidence showing that the Collier County is currently taking steps to implement a provision of the Collier Plan that provides for the extension of Wilson Boulevard. While the evidence may support plaintiffs' position, the only allegations in the First Amended Complaint pertaining to the Wilson Boulevard Extension are directly related to the terms of the proposed Settlement Agreement. Because plaintiffs have failed to allege that the Collier Plan provides for the extension of Wilson Boulevard or that defendants have taken any action in furtherance of the extension that is separate or distinct from the Settlement Agreement, the Court declines to address this issue at this time.

system of government, and helps to identify those disputes which are appropriately resolved through the judicial process." National Advertising Co. v. City of Miami, 402 F.3d 1335, 1339(11th Cir. 2005) (quoting Georgia State Conference of NAACP Branches v. Cox, 183 F.3d 1259, 1262 (11th Cir. 1999)) (citation and internal quotation marks omitted).

"Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662, 670 n.2 (2010) (citation and internal quotation marks omitted); National Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003). To determine whether a claim is ripe for judicial review, the court considers both "the fitness of the issues for judicial decision" and "the hardship of withholding court consideration." Stolt-Nielsen S.A., 559 U.S. at 670 n.2; National Park Hospitality Ass'n, 538 U.S. at 808. The court considers: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998). Strict application of the ripeness doctrine

prevents federal courts from rendering impermissible advisory opinions and wasting judicial resources through review of potential or abstract disputes. National Advertising Co., 402 F.3d at 1339.

In this matter, plaintiffs request an order finding that the conduct authorized by the Settlement Agreement violates Section 9 of the ESA. Such an order, however, would be an impermissible advisory opinion because the Settlement Agreement cannot be implemented without approval of the Circuit Court. See Fla. Stat. § 70.001(4)(d)(2). If Florida's Second Circuit Court of Appeals affirms the Order Denying Approval of Joint Settlement Agreement, any action by this Court would be for nought. See Pittman v. Cole, 267 F.3d 1269, 1278 (11th Cir. 2001) (claims are less likely to be considered fit for judicial review when they require "speculation about contingent future events"). "Put another way, '[h]aste makes waste, and the premature adjudication of legal questions compels courts to resolve matters, even constitutional matters, that may with time be satisfactorily resolved at the local level, and that may turn out differently in different settings.'" Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, Fla., 727 F.3d 1349, 1356 (11th Cir. 2013) (quoting Miles Christi Religious Order v. Twp. of Northville, 629 F.3d 533, 537 (6th Cir. 2010)). Because the claims relating to the Settlement Agreement hinge on

the pending appeal, they are not fit for judicial review and will be dismissed. Dismissal, however, will be without prejudice so that plaintiffs may reassert their claims if they become ripe at some later date.

**IV.**

Plaintiffs allege that defendants have authorized and allowed the HHH Ranch to perform agricultural land clearing on 604 acres of occupied Florida panther and red-cockaded habitat in violation of the ESA. Defendants assert that this claim should be dismissed because Collier County does not have the authority to regulate agricultural land clearing pursuant to Florida's Right to Farm Act, Fla. Stat. § 823.14. In response, plaintiffs state that:

> The County's current comprehensive land use plan and land development code provisions authorize land clearing of occupied habitat of ESA listed species merely upon the land owner providing notice of the land clearing to the County. The County ordinances do not restrict agricultural land clearing, nor do the County ordinances require land clearing only take place after the property owner obtained an ESA Section 10 HCP and ITP from the FWS. This ongoing County authorization of land clearing of occupied endangered species habitat is countrywide and is not limited [to] agricultural lands. Additionally, [plaintiffs'] land clearing claim against defendants is not limited to land clearing on the HHH Ranch in North Belle Meade.

(Doc. #23, pp. 8-9.)

After reviewing the First Amended Complaint, the Court is unable to find any factual or conclusory allegations supporting plaintiffs' assertion. Because the response indicates that

- 17 -

plaintiffs intend for the land clearing claim to cover more than the authorization and allowance of agricultural land clearing on the HHH Ranch, the Court will dismiss but grant plaintiffs leave to amend the claim to include other land clearing activity. Accordingly, plaintiffs' land clearing claim is dismissed without prejudice.

Accordingly, it is hereby

**ORDERED:**

1. Defendants' Motion to Dismiss (Doc. #22) is **GRANTED.** The First Amended Complaint is **DISMISSED WITHOUT PREJUDICE**.

2. Plaintiffs may file a second amended complaint **WITHIN FOURTEEN (14) DAYS** of this Opinion and Order.

**DONE and ORDERED** at Fort Myers, Florida, this ___17th___ day of June, 2014.

_____
JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

Copies:

Counsel of Record