UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FLORIDA     PANTHERS,     (Puma
concolor      coryi)        an
endangered   species,   RED-
COCKADED         WOODPECKERS,
(Picoides     boralis)     an
endangered species, FLORIDA
WILDLIFE FEDERATION, a not-
for-profit           Florida
corporation,    and   COLLIER
COUNTY   AUDUBON   SOCIETY,
INC.,    a    not-for-profit
Florida corporation,

          Plaintiffs,

v.                                    Case No: 2:13-cv-612-FtM-29DNF

COLLIER   COUNTY,   FLORIDA,   a
political subdivision of the
State of Florida, GEORGIA A.
HILLER,   in   her   official
capacity as a Collier County
Commissioner,  TOM  HENNING,
in his official capacity as
a      Collier      County
Commissioner, FRED W. COYLE,
in his official capacity as
a      Collier      County
Commissioner, and TIM NANCE,
in his official capacity as
Collier County Commissioner,

          Defendants.

_____

## OPINION AND ORDER

This matter is before the Court on the Third Amended Complaint

(Doc. #81) filed by the Florida panthers, the red-cockaded

woodpeckers (RCWs), the Florida Wildlife Federation (FWF), and the

Collier County Audubon Society, Inc. (CCAS) (collectively, plaintiffs) against Collier County, Florida and Collier County Commissioners Georgia A. Hiller, Tom Henning, Penny Taylor, and Tim Nance in their official capacities (collectively, defendants, County, or Collier County) for violations of the Endangered Species Act of 1973 (ESA), 16 U.S.C. §§ 1531-44. (Doc. #81.) Plaintiffs first assert that Collier County's written policies and regulations relating to the clearing of agricultural land, the issuance of building permits for single family residences in the North Belle Meade (NBM) and Northern Golden Gate Estates (NGGE) portions of the county, and the planned future extension of Wilson Boulevard are pre-empted by § 6(f) of the ESA because they are less stringent than the prohibitions in the ESA (Counts I-III). Plaintiffs then assert that the same policies and regulations and the planned future extension of Wilson Boulevard constitute a "take" in violation of § 9 of the ESA (Counts IV-VI). Plaintiffs seek declaratory and injunctive relief prohibiting defendants from continuing to implement, enact, or authorize these activities without first issuing a Habitat Conservation Plan (HCP) and obtaining an Incidental Take Permit (ITP). (Doc. #81, ¶¶ 1-2.)

The matter is now before the Court on defendants' Motion to Dismiss (Doc. #85), to which plaintiffs have filed a Response (Doc. #86). The parties also filed cross motions for summary judgment (Docs. ##87, 90), to which Responses (Docs. ##89, 93) were filed.

Also before the Court is plaintiffs' Third Request for Judicial Notice of Adjudicative Facts (Doc. #94), to which defendants' filed a Response (Doc. # 95).  The Court heard oral arguments on March 4, 2016.  The Court first provides some legal and factual background, then addresses the motions.

I.

**A.   The Endangered Species Act of 1973**

Congress enacted the Endangered Species Act (ESA) "to halt and reverse the trend toward species extinction, whatever the cost." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978).  "In accordance with this policy, the ESA provides for the listing of species as threatened or endangered and the designation of their critical habitat."  Defs. of Wildlife v. U.S. Dep't of the Navy, 733 F.3d 1106, 1111 (11th Cir. 2013) (citing 16 U.S.C. § 1533).  An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range," except for certain types of pests.  16 U.S.C. § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  Id. § 1532(20).  "Critical habitat" means

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed [as an endangered or threatened species] in accordance with the provisions of section 1533 of this title, on which are found

3

> those physical or biological features (I)
> essential to the conservation of the species
> and (II) which may require special management
> considerations or protection; and
>
> (ii) specific areas outside the geographical
> area occupied by the species at the time it is
> listed [as an endangered or threatened
> species] in accordance with the provisions of
> section 1533 of this title, upon a
> determination by the Secretary that such areas
> are essential for the conservation of the
> species.

Id. § 1532(5)(A).

One of the ways in which the ESA protects listed species and their critical habitat is by prohibiting anyone from "taking" a listed species.   Section 9 of the ESA makes it unlawful for any person subject to the jurisdiction of the United States to "take" any member of a listed endangered or threatened species within the United States.   16 U.S.C. § 1538(a)(1)(B).   "Take" is defined broadly, and means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."   16 U.S.C. § 1532(19); see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 704 (1995) ("Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions.").   The term "harass" is further defined by the regulations as an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to,

breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The regulations define "harm" as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3; see also Babbitt, 515 U.S. at 708; Miccosukee Tribe of Indians of Fla. v. United States, 716 F.3d 535, 542 (11th Cir. 2013); Loggerhead Turtle v. Cnty. Council of Volusia Cnty., 148 F.3d 1231, 1238 (11th Cir. 1998).

As an exception to the prohibition against a "take," Congress allows the Secretary of the Interior, acting through the United States Fish and Wildlife Service (FWS),[1] to issue a permit "under such terms and conditions as he shall prescribe" which allows an otherwise prohibited taking "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). As a prerequisite to receiving an Incidental Take Permit (ITP), the applicant must submit a Habitat Conservation Plan (HCP) "that specifies":

---

[1] The FWS administers the ESA with respect to species under the jurisdiction of the Secretary of the Interior. See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 651 (2007); 16 U.S.C. §§ 1532(15) (defining "Secretary" to include the Secretary of the Interior, the Secretary of Commerce, and the Secretary of Agriculture), 1539(a)(1); 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b).

(i) the impact which will likely result from such taking;

(ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;

(iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and

(iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.

16 U.S.C. § 1539(2)(A)(i)-(iv).  The applicant must also include a "complete description of the activity sought to be authorized" and "[t]he common and scientific names of the species sought to be covered by the permit, as well as the number, age, and sex of such species, if known[.]"  50 C.F.R. § 17.22(b)(1)(i)-(ii) (endangered wildlife);  50  C.F.R.  §  17.32(b)(1)(iii)(A)-(B)  (threatened wildlife).  See Loggerhead Turtle, 148 F.3d at 1238-39.

Upon receiving a complete application package, the FWS must publish notice in the Federal Register and provide the public an opportunity to comment on whether it should issue the permit.  16 U.S.C. § 1539(a)(2)(B); 50 C.F.R. § 17.22.  Upon expiration of the public comment period, the FWS must issue the permit if it finds that:

(i) the taking will be incidental;

(ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;

> (iii) the applicant will ensure that adequate funding for the plan will be provided;
>
> (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; . . .
>
> (v) the measures, if any, required under [16 U.S.C. § 1539(a)(2)(A)(iv)] will be met; [and]
>
> [the FWS] has received such other assurances as [it] may require that the [habitat conservation plan] will be implemented[.]

16 U.S.C. § 1539(a)(2)(B); 50 C.F.R. §§ 17.22(b)(2), 17.32(b)(2).

An incidental take permit "may authorize a single transaction, a series of transactions, or a number of activities over a specific period of time." 50 C.F.R. §§ 17.22, 17.32. The applicant's failure to comply "with the terms and conditions of the permit" requires the FWS to revoke the permit. 16 U.S.C. § 1539(a)(2)(C). See Loggerhead Turtle, 148 F.3d at 1239.

State law may be more restrictive than the ESA provisions, but may not be less restrictive. Section 6(f) of the ESA provides in pertinent part:

> Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.

16 U.S.C. § 1535(f).

The ESA provides for "citizen suits" to enforce its provisions. With certain exceptions not applicable to this case,

any person may commence a civil suit on his own behalf-- (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; . . . .

16 U.S.C. § 1540(g)(1)(A).

## B.   Endangered Species at Issue

### (1)   The Florida Panther

The Florida panther has been listed by the FWS as an endangered species since 1967. (Doc. #81, ¶¶ 18, 48); Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv., 677 F.3d 1073, 1076 (11th Cir. 2012). The Florida Fish and Wildlife Conservation Commission (FWCC) estimated in 2014 that the current population of Florida panther adults is approximately 100-180 (Doc. #81, ¶ 21), making the Florida panthers one of the most endangered species in the United States. (Id. ¶ 19.) A 2008 report calls for expansion of the adult population to 240. (Id. ¶ 20.) The current breeding population of Florida panthers is located on approximately 2.27 million acres in Collier, Lee, Hendry, Miami-Dade, and Monroe counties. The North Belle Meade (NBM) and the North Golden Gate Estates (NGGE) areas in Collier County have been designated as primary zone Florida panther habitat, and the presence of collared and uncollared Florida panthers has been well documented. (Id. ¶¶ 22-26.)

8

**(2)  The Red-Cockaded Woodpecker**

The red-cockaded woodpecker has been listed by the FWS as an endangered species under the ESA since 1970.  (See id. ¶¶ 27, 50); 50 C.F.R. § 17.11.  Both the FWS and the FWCC have identified colonies of red-cockaded woodpeckers in west and central NBM, and the FWCC has identified the lands in NBM to be strategic habitat for the red-cockaded woodpecker.  (Doc. #81, ¶ 28.)  The only documented occurrence of red-cockaded woodpeckers on private land in Collier County was in NBM.  (Id.)

The primary threats to the red-cockaded woodpecker are habitat loss, fragmentation by land clearing and roadways, habitat degradation, and isolation.  (Id. ¶ 29.)  Highways fragment red-cockaded woodpecker populations in three ways:  loss of large carnivores, habitat dissection, and the isolation of red-cockaded woodpeckers.  (Id.)  When highways fragment large carnivore populations, red-cockaded woodpeckers can suffer increased depredation from smaller carnivores such as bobcats, skunks, and weasels.  (Id.)  Habitat dissection and isolation often result in patches of habitat too small to function as red-cockaded woodpecker territory.  (Id.)

The FWS developed a recovery plan for red-cockaded woodpeckers, which requires:  (1) the location and preservation of viable pine forested habitats; (2) restoration of degraded pine forests; and (3) maintaining or creating pine forested wildlife

corridors which link or have the opportunity to link potential breeding groups of red-cockaded woodpeckers. (Id. ¶ 30.) Acres of foraging habitat and tree habitat have been cleared in the relatively recent past. (Id. ¶¶ 32-34.)

## C.  The Collier County Comprehensive Land Use Plan

In Florida, the legislative and governing body of a county has the power to carry on county government, including, to the extent not inconsistent with general or special state law, the power to "[p]repare and enforce comprehensive plans for the development of the county." Fla. Stat. § 125.01(g). The Florida Local Government Comprehensive Planning and Land Development Regulation Act, Chapter 163, Part II, requires a county to adopt a comprehensive land use plan to guide and control the use and future development of property within the county. Fla. Stat. § 163.3167(2); Citrus County v. Halls River Dev., Inc., 8 So. 3d 413, 415 (Fla. 5th DCA 2009). "The plan is likened to a constitution for all future development within the governmental boundary." Machado v. Musgrove, 519 So. 2d 629, 632 (Fla. 3d DCA 1987) (citations omitted).

Once a comprehensive plan has been adopted, "all development undertaken by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan" must be consistent with that plan. Fla. Stat. § 163.3194(1)(a). Each comprehensive plan must be reviewed every

seven years in an Evaluation and Appraisal Report ("EAR"), which is intended to assess the progress made in implementing the comprehensive plan. Fla. Stat. § 163.3191. A comprehensive plan may be amended through this process if the amendment is approved by the Florida Department of Community Affairs (FDCA). The Land Development Code (LDC) is the document that implements the comprehensive plan. If there is a conflict between the comprehensive plan and the LDC, the comprehensive plan prevails. Fla. Stat. § 163.3194(1)(b); Halls River Dev., Inc., 8 So. 3d at 415.

In 1989, Collier County enacted its first comprehensive land use plan (Doc. #81, ¶ 79), and in 1991, Collier County enacted its Land Development Code. On November 14, 1997, pursuant to the County's 1996 EAR, Collier County amended the Collier Plan. (Id.) On December 24, 1997, FDCA issued a Notice of Intent to find Collier County's EAR-based amendments not "in compliance," as defined by Fla. Stat. § 163.3184(1)(b). (Id.) After a five day evidentiary hearing, the Administrative Law Judge (ALJ) issued a Recommended Order finding that Collier County's EAR-based amendments were not in compliance with Chapter 163, Part II, Florida Statutes. (Id.) The Recommended Order was approved by the Florida Administration Commission on June 22, 1999, and a Final Order was entered directing Collier County to take steps to bring the Collier Plan into compliance with Chapter 163. (Id. ¶ 82.)

These steps included initiating a three year assessment of the area of Collier County designated on the Future Land Use Map as Agricultural/Rural and adoption of a plan no later than June 22, 2002 to implement the findings and results of the three year assessment. (Id.) Collier County was also required to direct incompatible land uses away from wetlands and upland habitats of listed species by means of creative planning techniques. (Id.)

As directed, Collier County conducted the three year assessment and elected to divide the Agricultural/Rural designated areas into two sub districts-the Rural Fringe and the Eastern Lands. (Id. ¶ 83.) The Eastern Lands, consisting of 196,000 acres surrounding Immokalee, was designated the Rural Lands Stewardship Area. (Id.) The Rural Fringe, consisting of 93,000 acres, including the 15,552 acre NBM area, was designated the Rural Fringe Mixed Use District. (Id.)

In July, 2002, Collier County enacted Collier County Ordinance No. 02-32, which amended the Collier Plan. (Id. ¶ 85.) The amendments included Conservation and Coastal Management Element (CCME) Objective 7.1, which mandated that the County "direct incompatible land uses away from listed animal species and their habitats." (Id. ¶ 85.) Pursuant to this Objective, Collier Plan CCME Policy 7.1.1 provided that incompatible land uses are directed away from listed species and their habitats by virtue of five different types of land use designations in the Future Land

Use Element (FLUE) of the Collier Plan: (1) the "Conservation" land use category; (2) the "Big Cypress Area of Critical State Concern Overlay" land use category; (3) the "Natural Resource Protection Areas" (NRPA) land use category; (4) the "Sending Lands" land use category, which had the right of transfer of development rights to "Receiving Lands"; and (5) the "Habitat Stewardship Areas" land use category, applicable to the Rural Lands Stewardship Area Overlay of the Collier Plan. (Id. ¶¶ 86, 87.) Receiving Lands are identified as "the most appropriate for development," and Sending Lands are deemed to have "the highest degree of environmental value and sensitivity" and are the principal target for preservation and conservation. (Id. at ¶ 88); Hussey v. Collier County, 158 So. 3d 661, 663 (Fla. 2d DCA 2014).

The Collier Plan currently designates approximately 10,673 acres of NBM as "Sending Lands," of which 6,075 acres are further designated as "NRPA Sending Lands." (Doc. #81, ¶ 89.) All of the 10,673 acres of NBM "Sending Lands" have been identified as occupied Florida panther habitat (id. ¶ 90), while approximately 3,547 acres of the NBM "Sending Lands" have been identified as RCW foraging habitat and 3,210 acres as RCW cavity tree habitat (id. ¶ 91). Residential use of "Sending Lands" under the Collier Plan is limited to one dwelling unit per parcel which existed as of June 22, 1999, or one dwelling unit per 40 acres. Non-residential

uses other than agriculture are limited in order to protect native habitat, wildlife, wildlife habitat, and wetlands.

## II.

Plaintiffs' request the Court take judicial notice of the October 1, 2015 Joint Motion for Court Approval of Settlement filed in Case Nos. 08-CA-6933 and 08-CA-6988 in the Circuit Court of the Twentieth Judicial Circuit and corresponding Settlement Agreement between Collier County and the owners of HHH Ranch, the Husseys. (Doc. #94.)  Defendants respond that they have no objection to the Court taking judicial notice of the contents of the Settlement Agreement and the fact that the Joint Motion was filed, but object to the Court taking judicial notice of "unspecified adjudicative facts" set forth in the Motion.  (Doc. #95.)

"The court may judicially notice a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  The "court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994) (internal quotation marks and citation omitted).

Accordingly, the Court will take judicial notice of the Joint Motion for Court Approval of Settlement and Settlement Agreement for the fact that the documents were filed in the Circuit Court and for purposes of what statements the documents contain, but not for the truth of the statements contained therein.

### III.

Defendants' motion to dismiss asserts that plaintiffs' claims must be dismissed because (1) they are not ripe for judicial review; (2) they fail to state a cause of action upon which relief may be granted; (3) they are barred by the statute of limitations; (4) they are barred by the Tenth Amendment; (5) they fail to join two indispensable parties (the State of Florida and the Fish and Wildlife Service); and/or (6) the individual county commissioners are entitled to legislative immunity. (Doc. #85.) Plaintiffs argue that none of the grounds for dismissal are well-founded.

Additionally, both sides have filed cross motions for summary judgement, asserting that they should win on all counts even before defendants have filed an Answer. (Docs. ##87, 90.) Each side opposes the other's summary judgment motion (Docs. ##89, 93), but both sides agreed at oral argument that there were no material disputed facts.

The Court will summarize each count, address the subject matter jurisdiction issue, and then resolve the motions as to individual counts.

15

**A.   Summary of Counts**

**(1)   Agricultural Land Clearing Counts:**

Collier Plan CCME Policies 6.1.1 and 6.1.2(c) & (d) require the preservation of the native vegetation in the environmentally high quality wildlife habitat which Collier County has designated as "Sending Lands" and "Natural Resource Protection Areas (NRPA) Sending Lands." (Doc. #81, ¶ 97.) CCME Policies 6.1.1 and 6.1.2 require land owners to preserve 80% of the native vegetation of "Sending Lands," and preserve 90% of the native vegetation of "NRPA Sending Lands." (Id.) Generally, a landowner may not clear lands designated as "Sending Lands" or "NRPA Sending Lands" unless the landowner first provides notice to Collier County by completing an Application for an Agricultural Clearing Notification. (Id. ¶ 110.) The landowner must also provide proof of ownership by means of a warranty deed or tax statement, pay a $250 application fee, provide an aerial photograph or site plan that includes a general vegetation inventory of the property, prove that the land was classified as agricultural by the County Property Appraiser, and provide a description and evidence of a bona fide agricultural operation on the property. (Id.) Collier County's Application for an Agricultural Clearing Notification contains the following provision:

> OTHER PERMITS/APPROVALS MAY BE REQUIRED FOR
> WATER USE (SFWMD), WILDLIFE ISSUES (USFWS AND
> FFWCC), WETLAND IMPACTS (USACOE AND SFWMD).

> THE OWNER IS RESPONSIBLE FOR OBTAINING ALL
> OTHER FEDERAL AND STATE AGENCY PERMITS AND
> PROVIDING COPIES TO COLLIER COUNTY LAND
> DEVELOPMENT SERVICES DEPARTMENT TO FILE PRIOR
> TO CLEARING OF LAND.

(Doc. #61-3, p. 6.)

CCME Policy 6.1.5 exempts new clearing of land for agricultural purposes from the native vegetation preservation requirements of CCME Policies 6.1.1 and 6.1.2, provided that "any new clearing of land for agriculture shall not be converted into non-agricultural development for 25 years." (Doc. #81, ¶¶ 104-05.) If the agricultural landowner complies with the procedural application process with Collier County, the landowner receives the County's authorization to clear the land without having to comply with the native vegetation preservation requirements or prepare any plan or obtain any permit pursuant to the ESA.

In an August 15, 2013 letter, FWS advised Collier County that land clearing for agricultural conversion was subject to the prohibitions of the ESA and the loss of habitat would likely result in a "take" of Florida panthers and RCWs. (Id. ¶ 120.) Thus, the landowner cannot actually clear land for agricultural purposes without obtaining the ITP required by the ESA in addition to the County's authorization. Collier County has never denied an Agricultural Clearing Notification application for land in NBM (id. ¶ 111), and as of April 29, 2014, had received and approved

twenty-four Applications for an Agricultural Clearing Notification concerning 975.39 acres of land in NBM, (id. ¶ 115).

In Count I of the Third Amended Complaint, plaintiffs allege that CCME Policy 6.1.5 is pre-empted by § 6(f) of the ESA because it is less restrictive than the obligations imposed by the ESA, and seek declaratory and prospective injunctive relief. (Id. ¶¶ 35, 48, 51, 75-76, 104-08.) In Count IV of the Third Amended Complaint, plaintiffs assert that the County's "foreseeable future authorizations of agricultural land clearing of occupied Florida panther and RCW habitat in NBM will reasonably likely cause injury, harm and harassment to the Florida panthers and RCWs" which constitute a "take" under ESA § 9. (Doc. #81, ¶¶ 199, 217-26.)

**(2)  Single Family Dwellings Permitting Counts:**

CCME Policy 7.1.2 provides in pertinent part that "non-agricultural development, excluding single family residences, shall be directed away from listed species and their habitats" by complying with certain guidelines and standards, including wildlife surveys of listed species and development of a wildlife management plan describing how the project directs incompatible land uses away from the listed species and their habitats. (Doc. #81, ¶ 145.) This provision thus exempts individual single family residences from being directed away from listed species and their habitat and from having to comply with the guidelines and standards outlined in CCME Policy 7.1.2. (Id. ¶ 146.) As a result of this

exemption, Collier County has approved the platting of residential lots of five acres or less in NBE and NGGE and has annually issued development permits for single family residences on approximately 1,740 acres of vacant single family lots in NGGE. (Doc. #33-1, ¶¶ 68, 71.)

In Count II of the Third Amended Complaint, plaintiffs allege that CCME Policy 7.1.2 is pre-empted by § 6(f) of the ESA because it is less stringent than obligations imposed by the ESA, and seek declaratory and injunctive relief. (Doc. #81, ¶¶ 126, 165-66.) In Count V of the Third Amended Complaint, plaintiffs assert that the County's "past and foreseeable future authorizations of individual single-family residences in NBM and NGGE in occupied Florida panther Primary and Secondary Zone habitat has caused indirect violations of ESA §9, and is reasonably likely in the future to cause, cause [sic] indirect injury, harm and harassment of Florida panthers in violation of ESA §9." (Id. ¶¶ 228, 249-52.)

### (3) Wilson Boulevard Extension Counts:

The Collier County Plan and Collier County's Long Range Transportation Plan authorize the extension of Wilson Boulevard through NBM, which will sever approximately 4,000 acres of occupied Florida panther breading habitat. (Doc. #87, pp. 19-21.) Collier County is currently using advanced right-of-way dedications, Developer Contribution Agreements, zoning approvals, and

reservation agreements to obtain and maintain the right-of-way dedications for the Wilson Boulevard Extension. (Id. at 20.) Florida Rock Industries, Inc. is currently performing the design duties for Phase I of the Wilson Boulevard Extension pursuant to a Developer Agreement with Collier County. (Id. at 20-21.)

On May 8, 2009, the FWS submitted written objections regarding the Wilson Boulevard Extension to the Collier County Transportation Department. (Doc. #33-1, ¶ 55.) The FWS recommended that Collier County consider a landscape level approach to conservation and development, especially in areas needed by the Florida panther and other federally listed species. (Id.) The FWS also recommended that Collier County work with FWS "to develop a county-wide Habitat Conservation Plan" for county projects. (Id.)

In Count III of the Third Amended Complaint, plaintiffs allege that the County's "foreseeable future regulatory actions related to the implementation of the Wilson Boulevard Extension in NBM without the FWS approval and issuance of an ESA §10 HCP and ITP" are pre-empted by ESA § 6(f). (Doc. #81, ¶ 167.) The "regulatory actions" taken by the County are the adoption of a Long Range Transportation Plan depicting the extension; enactment of the Collier Plan NBM Overlay map which depicts and authorizes the extension; the enactment of the Collier Plan FLUE text referring to the extension and obtaining dedicated land by ongoing rezoning;

official identification and public notice of the extension; use of various methods to obtain the right-of-way dedications for the extension; execution of a 2007 Developer Agreement requiring a certain corporation to dedicate, design, and construct Phase I of the extension; 2014 approval by the County Board of Commissioners of the purchase 302 acres in NBM to accommodate the future extension; and right-of-way negotiations with the owners of HHH Ranch for the extension. (Id. ¶ 191.) It is further alleged that the regulatory actions are less restrictive than requirements of the ESA (Id. ¶ 197), and therefore pre-empted by § 6(f) of the ESA.

In addition to the pre-emption claim, Count III also includes a substantive taking claim similar to that in Count VI. Plaintiffs assert that the County "has taken regulatory actions to designate and implement the extension of Wilson Boulevard . . . as an urban design, 180 foot wide, four-lane roadway" severing occupied Florida panther breeding acreage and passing through RCW habitat resulting in an incidental take. (Id. ¶¶ 186-90). The County has refused to apply for an ESA §10 HCP and ITP for the road extension (id. ¶¶ 192, 198), and plaintiffs allege that this "has the likely foreseeable impact of eliminating consideration of alternatives" to that route, "eliminating currently available maximum practicable minimization actions," and reducing the likelihood of survival and recovery of the Florida panther, (id. ¶¶ 193-96).

These regulatory actions are alleged to constitute an indirect illegal harming and harassing of the Florida panther and RCW. (<u>Id.</u> ¶ 196.)

In Count VI of the Third Amended Complaint, plaintiffs assert that the County's "past and foreseeable future authorizations of the extension of Wilson Boulevard in NBM in occupied Florida panther Primary and Secondary Zone habitat, and occupied RCW habitat, will in the future cause indirect injury, and direct harm and harassment of Florida panthers and RCWs in violation of ESA §9." (<u>Id.</u> ¶¶ 254, 273-79.)

**B.   Subject Matter Jurisdiction:   Ripeness of Claims**

Defendants assert that the district court lacks subject matter jurisdiction[2] because none of the claims are ripe for judicial review. (Doc. #85, pp. 4-6.) Subject matter jurisdiction challenges are addressed in a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). <u>Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs</u>, 709 F.3d 1055, 1058 (11th Cir. 2013); <u>Goodman ex rel Goodman v. Sipos</u>, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001).

---

[2] Plaintiffs' reliance on 28 U.S.C. § 1361 for jurisdiction (<u>id.</u> at ¶¶ 36, 127, 168, 200, 229, 255) is misplaced because this is not an action to compel a federal officer, employee, or agency to do anything; no federal officer, employee, or agency is a named party.   Further, plaintiffs' reliance on 28 U.S.C. § 2201(a) for jurisdiction (<u>id.</u>) is misplaced because the Declaratory Judgment Act does not enlarge the jurisdiction of a federal court, but is procedural only.   <u>Wendy's Int'l, Inc. v. City of Birmingham</u>, 868 F.2d 433, 435 (11th Cir. 1989).

When a motion to dismiss is based on a factual challenge to subject matter jurisdiction and the jurisdictional basis of the claim is intertwined with the merits of the case, the court applies the Rule 56 summary judgment standard in determining whether dismissal is appropriate.  Lawrence v. Dunbar, 919 F.2d 1525, 1530 (11th Cir. 1990).

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." Gunn v. Minton, 133 S. Ct. 1059, 1064 (2013) (internal quotation marks omitted) (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)).  "Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' which restricts the authority of federal courts to resolving the legal rights of litigants in actual controversies." Genesis Healthcare Corp. v. Symczyk, 133 S. Ct. 1523, 1528 (2013) (internal quotation marks and citation omitted).  See also Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014).  Ripeness principles "originate[] from the Constitution's Article III requirement that the jurisdiction of the federal courts be limited to actual cases and controversies." Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1308 (11th Cir. 2009) (citation omitted).

To determine whether a claim is ripe for judicial review, courts consider both "the fitness of the issues for judicial

decision" and "the hardship of withholding court consideration." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 670 n.2 (2010);  Nat'l Park Hosp. Ass'n v. Dep't of the Interior, 538 U.S. 803, 808 (2003).  In the administrative context, courts consider:  "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."  Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998).  Generally, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted).  Ripeness is a "justiciability doctrine designed to prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies" and to "shield[] agencies from judicial interaction until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, 727 F.3d 1349, 1356 (11th Cir. 2013) (internal quotation marks and citations omitted).  The ripeness of a claim is a legal question.  Temple B'Nai Zion, Inc., 727 F.3d at 1356.

Application of the ripeness principles varies depending on whether the challenge to the regulation is facial or as-applied.

> Because the question of ripeness depends on the timing of the adjudication of a particular issue, it applies differently to facial and as-applied challenges. A facial challenge asserts that a law always operates unconstitutionally; therefore, a facial challenge will succeed only if the statute could never be applied in a constitutional manner. In the context of a facial challenge, a purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record. An as-applied challenge, by contrast, addresses whether a statute is unconstitutional on the facts of a particular case or to a particular party. Because such a challenge asserts that a statute cannot be constitutionally applied in particular circumstances, it necessarily requires the development of a factual record for the court to consider.

Harris, 564 F.3d at 1308 (internal quotation marks, emphasis, and citations omitted.)   In this case, plaintiffs assert a facial challenge to the CCME Policies in Count I, Count II, and a portion of Count III; they assert as-applied challenges in Counts IV-VI and a portion of Count III.

Defendants in turn assert a facial challenge to the ripeness of the claims, asserting that the complaint "remains absent of factual allegations which would establish that Plaintiffs' claims are ripe for review," (Doc. #85, pp. 2-3) and that the claims are insufficient as a matter of law to establish ripeness because "Plaintiffs have not alleged sufficient facts to causally connect

these acts with any harm to the Florida panthers or RCWs," (id. at 5). "A 'facial attack' on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." McElmurray v. Consol. Gov't of Augusta-Richmond Cnty., 501 F.3d 1244, 1251 (11th Cir. 2007) (internal quotation marks and alterations omitted). If a court determines it has no subject matter jurisdiction, its only remaining function is to dismiss the case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998). Because this is not a decision on the merits, any dismissal must be without prejudice. Stalley ex rel U.S. v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008).

Two preliminary issues regarding ripeness are raised by plaintiffs. First, plaintiffs assert that the ripeness doctrine is simply not applicable to ESA citizen suits because Congress has authorized "ESA citizen suits which allege potential wholly-future violations of the ESA." (Doc. #86, p. 6.) The Court disagrees.

As discussed above, ripeness is an Article III requirement, and as such it cannot be entirely swept aside by Congress. The Court concludes, however, that Congress has not attempted to do so with the ESA citizen suit provisions. While some claims for future violations are allowable under the ESA, the threat of future harm

must still satisfy Article III.   See Sierra Club, 523 U.S. 726 (holding the controversy brought under the ESA was not ripe for judicial review).   Plaintiffs' position that "potential wholly-future violations of the ESA" are always ripe results in federal courts being in the advisory opinion business which, as noted in Clinton v. Jones, 520 U.S. 681, 700 n.33 (1997), has been rejected for centuries.   Rather, for future injuries to be ripe, they must satisfy the standard for an injury sufficient to invoke Article III standing:

> [A]n injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.   Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.   Thus, we have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.

Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks, citations, and alterations omitted.)

Second, the Court also rejects plaintiffs' reliance on "prudential" principles relating to ripeness.   A unanimous Supreme Court has retreated from "prudential" standing principles not founded on Article III requirements, Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377 (2014), and the Supreme

Court has declined to consider the continuing vitality of the prudential ripeness doctrine where there was a sufficient Article III injury. <u>Driehaus</u>, 134 S. Ct. at 2347. What were previously referred to as "prudential" principles are actually the interpretation of the particular statutes at issue, and do not replace Article III determinations. <u>Lexmark Int'l, Inc.</u>, 134 S. Ct. at 1387-88.

With these preliminary matters addressed, the Court considers the ripeness of the individual counts.

### (1)  Count I:  Agricultural Land Clearing Exemption

In Count I of the Third Amended Complaint, plaintiffs allege that Policy 6.1.5 is pre-empted by § 6(f) of the ESA because it is less restrictive than the obligations imposed by the ESA. This is a facial challenge to Policy 6.1.5, and is ripe as pled. <u>Harris</u>, 564 F.3d at 1308. No further factual development is necessary to determine the validity of the challenge to CCME Policy 6.1.5, and delayed review would cause undue hardship to plaintiffs. Accordingly, the Court concludes that Count I is ripe for judicial review.

### (2)  Count II:  Single-Family Residence Exemption

In Count II of the Third Amended Complaint, plaintiffs allege that CCME Policy 7.1.2 is pre-empted by § 6(f) of the ESA because it is less stringent than obligations imposed by the ESA. This is a facial challenge to Policy 7.1.2, and is ripe as pled. <u>Id.</u> No

further factual development is necessary to determine the validity of the challenge to CCME Policy 7.1.2, and delayed review would cause undue hardship to plaintiffs.    Accordingly, the Court concludes that Count II is ripe for judicial review.

(3)   **Count III:  Wilson Boulevard Extension**

In Count III of the Third Amended Complaint, plaintiffs allege that the County's "foreseeable future regulatory actions related to the implementation of the Wilson Boulevard Extension in NBM without the FWS approval and issuance of an ESA §10 HCP and ITP" are pre-empted by ESA §6(f). (Doc. #81, ¶ 167.) Plaintiffs assert that the County "has taken regulatory actions to designate and implement the extension of Wilson Boulevard," and identifies these "regulatory actions." (Id. ¶¶ 186-91.) Count III further alleges that the regulatory actions are less restrictive than the requirements of the ESA (id. ¶ 197), and therefore pre-empted by § 6(f) of the ESA.

This portion of Count III is a facial challenge to the "regulatory actions" and is ripe as pled.  Harris, 564 F.3d at 1308.  No further factual development is necessary to determine the validity of the challenge to the "regulatory actions," and delayed review would cause undue hardship to plaintiffs. Accordingly, the Court concludes that the pre-emption portion of Count III is ripe for judicial review.  The portion of Count III

setting forth a "take" claim will be discussed in connection with Count VI.

### (4)  Count IV:  Agricultural Land Clearing Activities

In Count IV of the Third Amended Complaint, plaintiffs assert that the County's "foreseeable future authorizations of agricultural land clearing of occupied Florida panther and RCW habitat in NBM will reasonably likely cause injury, harm and harassment of Florida panthers and RCWs" which constitutes a "take" under ESA § 9.  (Doc. #81, ¶¶ 199, 217-26.)  This is an as-applied challenge to the County policy, and the Court finds it to be ripe for judicial review.

The Third Amended Complaint alleges that Collier County has processed twenty-four Applications for an Agricultural Clearing Notification concerning 975.39 acres of land in NBM, and has never denied such an application.  The fact that Applications are being submitted and granted is sufficient to satisfy the injury requirement for Article III purposes.  Because Collier County has implemented, and continues to implement CCME Policy 6.1.5, plaintiffs' allegations of "takings" do not rest on contingent, hypothetical future events, and are fit for adjudication.

### (5)  Count V:  Single-Family Residence Permitting Activities

In Count V of the Third Amended Complaint, plaintiffs assert that the County's "past and foreseeable future authorizations of individual single-family residences in NBM and NGGE in occupied

Florida panther Primary and Secondary Zone habitat has caused indirect violations of ESA §9, and is reasonably likely in the future to cause, cause [sic] indirect injury, harm and harassment of Florida panthers in violation of ESA §9." (Id. ¶¶ 228, 249-52.)  This is an as-applied challenge to the County policy, and the Court finds it to be ripe for judicial review.

The Third Amended Complaint alleges that Collier County has approved the platting of residential lots of five acres or less in NBM and NGGE, and has issued development permits for single family residences on approximately 1,740 acres of vacant single family lots in NGGE.  The fact that single family residence permits are being submitted and granted is sufficient to satisfy the injury requirement for Article III purposes.  Because Collier County has implemented, and continues to implement, CCME Policy 7.1.2, plaintiffs' allegations of "takings" do not rest on contingent, hypothetical future events, and are fit for adjudication.

### (6) Counts III and VI:  Wilson Boulevard Extension Activities

Count III alleges that the identified County regulatory actions constitute an indirect illegal harming and harassing of the Florida panther and RCW (id. ¶ 196), and the County has refused to apply for an ESA § 10 HCP and ITP for the road extension, (id. ¶¶ 192, 198).  Plaintiffs assert that this "has the likely foreseeable impact of eliminating consideration of alternatives"

to that route, "eliminating currently available maximum
practicable minimization actions," and reducing the likelihood of
survival and recovery of the Florida panther. (Id. ¶¶ 193-96.)
This is an as-applied challenge to Collier County's regulatory
actions.

In Count VI of the Third Amended Complaint, plaintiffs assert
that the County's "past and foreseeable future authorizations of
the extension of Wilson Boulevard in NBM in occupied Florida
panther Primary and Secondary Zone habitat, and occupied RCW
habitat, will in the future cause indirect injury, and direct harm
and harassment of Florida panthers and RCWs in violation of ESA
§9." (Id. ¶¶ 254, 273-79.)  This is an as-applied challenge to
the County policy.

Defendants do not dispute an intent to someday extend Wilson
Boulevard, or that they have taken the steps identified in the
Third Amended Complaint.  Defendants assert, however, that
plaintiffs' claim regarding the Wilson Boulevard Extension is not
ripe because "there is no evidence that the County will construct
the Wilson Boulevard extension in a manner which is not in
compliance with the ESA." (Doc. #90, p. 14.)  The County does not
dispute that at some point it will need to comply with the ESA
requirements, but asserts now is not that time.

Plaintiffs contend that its claims regarding the Wilson
Boulevard Extension are ripe for review because the ESA allows for

claims based upon "wholly-future" violations. (Doc. #87, p. 9.) The Court disagrees with defendants' position, as discussed earlier.

The gist of Count III and Count VI is that the regulatory actions taken so far by the County requires the County to submit the HCP and obtain an ITP for the Wilson Boulevard extension. Plaintiffs allege that what the County has done to date effectively eliminates potential alternative routes for the extension, which makes the regulatory actions ripe for judicial challenge.

The Court concludes that the Count III and Count VI claims — that the County is obligated to comply with the ESA HCP and ITP obligations now — is ripe for judicial review.  No speculation of future events is involved, since plaintiffs assert that the County has already passed the threshold for ESA compliance.  See Pittman v. Cole, 267 F.3d 1269, 1278 (11th Cir. 2001) (claims are less likely to be considered fit for judicial review when they require "speculation about contingent future events").  While the parties dispute whether the time has come for the County to proceed with the HCP and ITP, that dispute goes to the merits of the dispute, not a jurisdictional ripeness issue.

The Court concludes that all six counts are ripe for judicial review.  Defendant's motion to dismiss on ripeness grounds is denied.

C.   **Motion to Dismiss and Motion for Summary Judgment Standards**

Defendants seek dismissal of all counts for failure to state a claim upon which relief may be granted.  Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(citation omitted).  To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level."  Id. at 555.  See also Edwards v. Prime Inc., 602 F.3d 1276, 1291 (11th Cir. 2010).  This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citations omitted).[3]

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, Erickson v. Pardus, 551 U.S. 89 (2007), but "[l]egal conclusions without adequate

_____

[3] The Court rejects plaintiffs' reliance on the former, now retired, standard that a complaint should not be dismissed unless it appears beyond a doubt that plaintiff can prove no set of circumstances that would entitle him to relief.  (Doc. #86, p. 3.) See Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 714 (11th Cir. 2014).

factual support are entitled to no assumption of truth," <u>Mamani</u> <u>v. Berzain</u>, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678. "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." <u>Chaparro v. Carnival Corp.</u>, 693 F.3d 1333, 1337 (11th Cir. 2012)(internal quotation marks and citations omitted). Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." <u>Iqbal</u>, 556 U.S. at 679.

All parties also seek summary judgment on all counts. Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." <u>Baby Buddies, Inc. v. Toys "R" Us, Inc.</u>, 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material" if it may affect the outcome of the suit under governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the

non-moving party.  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Tana v. Dantanna's</u>, 611 F.3d 767, 772 (11th Cir. 2010).  However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." <u>St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.</u>, 198 F.3d 815, 819 (11th Cir. 1999) (quoting <u>Warrior Tombigbee Transp. Co. v. M/V Nan Fung</u>, 695 F.2d 1294, 1296 (11th Cir. 1983) (finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")).  "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." <u>Allen v. Bd. of Pub. Educ.</u>, 495 F.3d 1306, 1315 (11th Cir. 2007).

## D. Individual Counts

With the jurisdictional matter resolved for each count, the Court will address the issues raised in the motions as they relate to the individual counts.  At oral argument neither party believed it mattered whether the issues were decided under a motion to dismiss standard or a summary judgment standard.

### (1) Count I:  ESA Pre-emption of CCME Policy 6.1.5

#### (a) Dismissal for Failure to State a Claim:

Defendants assert that Count I, which alleges that CCME Policy 6.1.5 is pre-empted by the ESA, fails to state a claim upon which

relief may be granted.  Defendants argue that under the Supremacy Clause, a state regulation is pre-empted only if (a) expressly pre-empted by Congress, or (b) Congress has occupied a field with comprehensive regulation, or (c) there is a conflict between state and federal law.  This requires, defendants argue, that plaintiffs show the CCME Policies are regulations "respecting the taking of an endangered species or threatened species" which prevent federal agencies from protecting those species.  Defendants argue that none of these situations exist in this case, and therefore CCCM Policy 6.1.5 is not pre-empted.  (Doc. #85, pp. 7-8.)

Plaintiffs disagree, and respond that they have adequately pled and shown that CCME Policy 6.1.5 is expressly pre-empted pursuant to 16 U.S.C. § 1535(f) because the regulations are facially less restrictive than the ESA taking provisions.  (Doc. #81, pp. 10-38; Doc. #87, pp. 14-17.)  At oral argument, plaintiffs asserted that all three grounds for pre-emption apply in this case.

At the motion to dismiss stage of the proceedings, the issue is whether plaintiffs have alleged sufficient facts to establish a plausible pre-emption claim.  After a review of the Third Amended Complaint, the Court finds that plaintiffs have met this standard as to Count I.  Therefore, this portion of the motion to dismiss is denied.

**(b)   Dismissal Based on Statute of Limitations:**

Defendants assert that all of the claims in the Third Amended Complaint are barred by the six year statute of limitations because the offending conduct first occurred in 2006 and the Collier Plan was amended in 2002.  (Doc. #85, p. 16.)  Plaintiffs respond that there is simply no statute of limitations issue in this case since the unlawful conduct is ongoing.

"Generally, the existence of an affirmative defense will not support a motion to dismiss," Quiller v. Barclays Am./Credit, Inc., 727 F.2d 1067, 1069 (11th Cir. 1984), aff'd on reh'g, 764 F.2d 1400 (11th Cir. 1985) (en banc) (per curiam) (reinstating panel opinion), because plaintiffs are not required to negate an affirmative defense in their complaint.  La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).  A complaint may be dismissed, however, when the existence of an affirmative defense "clearly appears on the face of the complaint." Quiller, 727 F.2d at 1069.  See also Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011); La Grasta, 358 F.3d at 845 ("[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred") (quoting Omar ex rel. Cannon v. Lindsey, 334 F.3d 1246, 1251 (11th Cir. 2003)); Douglas v. Yates, 535 F.3d 1316, 1321 (11th Cir. 2008)(same).

Here, it is clear from the Third Amended Complaint that all the activities which plaintiffs assert violate the ESA are ongoing and will continue in the foreseeable future.  There is no statute of limitations defense which is so clearly set forth on the face of the Third Amended Complaint that dismissal would be justified. This portion of the motion to dismiss is denied.

### (c)  Dismissal of Claims as Barred by Tenth Amendment

Defendants assert that plaintiffs seek to compel Collier County and its Commissioners to require applicants for land clearing to first comply with their ESA obligations.  As such, defendants argue that all claims are barred by the Tenth Amendment to the United States Constitution because the federal government cannot compel a local government to enforce or administer a federal regulatory program.  (Doc. #85, pp. 16-17.)  Plaintiffs respond that they have requested no such relief, but merely ask that the County be prevented from enforcing the challenged portions of the CCME Policies.

Generally, the Tenth Amendment precludes Congress from requiring a state legislature to enact any laws or regulations, and from commanding state officers to administer or enforce a federal regulatory program.  Printz v. United States, 521 U.S. 898, 935 (1997); New York v. United States, 505 U.S. 144, 162-70 (1992); Montgomery Cnty. Comm'n v. Fed. Hous. Fin. Agency, 776 F.3d 1247, 1260-61 (11th Cir. 2015).  This is an affirmative

defense, and is not so clearly set forth on the face of the Third Amended Complaint that dismissal would be justified.  This portion of the motion to dismiss is denied.

### (d)  Failure to Join Indispensable Parties

Defendants assert that the Third Amended Complaint must be dismissed because plaintiffs have not joined the State of Florida or the FWS, both of whom are indispensable parties.  (Doc. #85, p. 17.)  Plaintiffs deny that either is an indispensable party.

To determine whether a person or entity is required to be joined as a party, a court determines whether under Rule 19(a)(1) the person in question is one who should be joined if feasible. Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1279-80 (11th Cir. 2003).  This requires the court to determine if the unnamed person or entity is "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction" and whether:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:(i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1039 (11th Cir. 2014).

Here, neither proposed party is a party who should be joined under Rule 19(a)(1). "A party is considered 'necessary' to the action if the court determines either that complete relief cannot be granted with the present parties or the absent party has an interest in the disposition of the current proceedings." <u>Laker Airways, Inc. v. British Airways, PLC</u>, 182 F.3d 843, 847 (11th Cir. 1999). Plaintiffs do not seek any relief from the State of Florida or the FWS, and complete relief can be granted without their presence and participation in the litigation. Resolving the case will not impair or impede the State of Florida or the FWS in their ability to protect their interests, or leave Collier County subject to a substantial risk of incurring inconsistent obligations. Accordingly, this portion of the motion to dismiss is denied.

### (e) Legislative Immunity

Defendants assert that the Third Amended Complaint must be dismissed as to the individual defendants sued in their official capacities because each is entitled to legislative immunity. (Doc. #85, pp. 17-19.) Plaintiffs assert defendants are not entitled to such immunity.

When exercising functions in the sphere of legitimate legislative activity, state, regional, local legislators, and their surrogates enjoy immunity from civil liability which is parallel to that provided in the Speech and Debate Clause of the

41

United States Constitution.  *Bogan v. Scott-Harris*, 523 U.S. 44, 48-55 (1998); *Bryant v. Jones*, 575 F.3d 1281, 1303 (11th Cir. 2009); *Woods v. Gamel*, 132 F.3d 1417, 1419 (11th Cir. 1998); *Ellis v. Coffee Cnty. Bd. of Registrars*, 981 F.2d 1185, 1192 (11th Cir. 1993).  "Whether an act is legislative turns on the nature of the act," not the intent or motive of the official.  *Bogan*, 523 U.S. at 54.  Officials claiming protection "must show that such immunity is justified for the governmental function at issue."  *Hafer v. Melo*, 502 U.S. 21, 29 (1991).  The privilege applies only to legislators engaging in actions considered "an integral part of the deliberative and communicative processes by which [legislators] participate in . . . proceedings with respect to the consideration and passage or rejection of proposed legislation."  *Smith v. Lomax*, 45 F.3d 402, 405 (11th Cir. 1995) (alterations in original) (citations omitted).  Voting for an ordinance or other legislation is "quintessentially legislative."  *Bogan*, 523 U.S. at 55.  Legislative immunity does not, however, protect the entity itself.  *Id.* at 53.

Here, Count I is a facial challenge to CCCM Policy 6.1.5, in which plaintiffs claim its very existence is unlawful.  The only relevant conduct committed by the commissioners in such a challenge is the enactment of the county legislation, which is "quintessentially legislative."  While legislative immunity is an affirmative defense, the face of the complaint clearly establishes

that the individual defendants are entitled to absolute immunity as to Count I.  In looking at the summary judgment record, it is clear that any attempt to further amend this count would be futile. Therefore, defendants' motion to dismiss Count I as to the individual defendants in their official capacities is granted and Count I is dismissed with prejudice as to the Commissioners.

### (f)  Summary Judgment

The issue in Count I is whether CCME Policy 6.1.5 is pre-empted by the ESA.  Plaintiffs assert the answer is yes because CCME Policy 6.1.5 is less restrictive than the obligations under the ESA, while defendants assert the answer is no because CCME Policy 6.1.5 is not less restrictive than the ESA obligations and it is not impossible to comply with both CCME Policy 6.1.5 and the ESA provisions. (Doc. #89, pp. 4-5, 10-12; Doc. #90, pp. 7-11.)

The Supremacy Clause, U.S. Const. Art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to," federal law. Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 712 (1985) (citation omitted).  Federal law can pre-empt state law in three ways:  (1) Congress may expressly pre-empt state law; (2) pre-emption may be inferred where Congress has occupied a given field with comprehensive regulation; and (3) state law is pre-empted to the extent that it actually conflicts with federal law. Id.  At oral argument, plaintiffs asserted that all three types of pre-emption apply here.

i.        **Express Pre-emption**

The ESA pre-emption provision, entitled "Conflicts between Federal and State laws," provides in pertinent part:

> Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.

16 U.S.C. § 1535(f). The Court's "task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." Sprietsma v. Mercury Marine, 537 U.S. 51, 62-63 (2002) (quoting CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).

The parties agree that this provision allows Collier County to have and enforce more restrictive laws and regulations than the ESA and its implementing regulations, but not less restrictive laws and regulations. (Doc. #87, pp. 6-7; Doc. #90, pp. 7-8.) The parties disagree, however, as to whether or not CCME Policy 6.1.5 is in fact more or less restrictive that the ESA and its implementing regulations.

As previously discussed, a landowner may not clear agricultural land designated as "Sending Lands" or "NRPA Sending Lands" unless the landowner first completes an Application for an Agricultural Clearing Notification, provides proof of ownership by

44

means of a warranty deed or tax statement, pays a $250 application

fee, provides an aerial photograph or site plan that includes a

general vegetation inventory of the property, proves that the land

was classified as agricultural by the County Property Appraiser,

and provides a description and evidence of a bona fide agricultural

operation on the property.   The County's Application for an

Agricultural Clearing Notification provides that:

> OTHER PERMITS/APPROVALS MAY BE REQUIRED FOR
> WATER USE (SFWMD), WILDLIFE ISSUES (USFWS AND
> FFWCC), WETLAND IMPACTS (USACOE AND SFWMD).
> **THE OWNER IS RESPONSIBLE FOR OBTAINING ALL
> OTHER FEDERAL AND STATE AGENCY PERMITS AND
> PROVIDING COPIES TO COLLIER COUNTY LAND
> DEVELOPMENT SERVICES DEPARTMENT TO FILE PRIOR
> TO CLEARING OF LAND.**

(Doc. #61-3, p. 6) (emphasis added).   Reiterating this obligation,

Collier County enacted LDC § 10.02.06(A)(1)(a), which provides:

> Required state and/or federal permits.   Where
> proposed use or developments requires state or
> federal development orders or permits prior to
> use or development, **such development orders or
> permits must be secured from state or federal
> agencies prior to commencement of any
> construction and/or development,** including
> any changes in land configuration and land
> preparation.

(emphasis added).   Thus, while landowners are not required to

comply with the ESA prior to obtaining Collier County's approval

for Agricultural Clearing, the County advises and requires

landowners to comply with their ESA obligations prior to actual land clearing.[4]

The Court holds that 16 U.S.C. § 1535(f) does not pre-empt CCME Policy 6.1.5 because CCME Policy 6.1.5 is not less restrictive than the ESA and its implementing regulations. CCME Policy 6.1.5 requires the landowner to obtain all other federal and state agency permits and provide copies to Collier County prior to clearing the land. It imposes additional requirements such as submitting an Application to the County, payment of a fee, and submission of certain documents. In appropriate circumstances the landowner will need to comply with the ESA prior to land clearing, but nothing in the ESA requires that the county authorization be withheld until after the federal requirements are satisfied.

---

[4] The County established this order based upon its belief that it was not allowed to do otherwise by Florida law. In order to eliminate duplication of regulatory authority over agricultural activities, the Florida Legislature enacted the Florida Right to Farm Act. Fla. Stat. § 823.14(2). The Act provides, in relevant part, that "a local government may not adopt any ordinance, regulation, rule, or policy to prohibit, restrict, regulate, or otherwise limit an activity of a bona fide farm operation on land classified as agricultural land pursuant to s. 193.461." Fla. Stat. § 823.14(6). See also Fla. Stat. § 163.3162. Because the Right to Farm Act prohibits local governments from adopting ordinances restricting agricultural activities, Wilson v. Palm Beach County, 62 So. 3d 1247, 1250 (Fla. 4th DCA 2011), Collier County exempted agriculture from the preservation requirements otherwise set forth in the CCME and LDC. (Doc. #61-3, p. 2.) Instead, the regulations adopted by Collier County place the impetus on the landowner to obtain the necessary permits and approvals.

Obtaining Collier County authorization for agricultural land clearing is an additional requirement, not a replacement of a federal requirement. Summary judgment is therefore granted in favor of defendants as to this issue.

### ii.    Occupy the Field Pre-emption

Plaintiffs asserted during oral argument that CCME Policy 6.1.5 is also pre-empted because the ESA occupies the field. The Court disagrees.

"Field preemption exists where Congress determines that a certain field must be regulated exclusively by the federal government." Fresenius Med. Care Holdings, Inc. v. Tucker, 704 F.3d 935, 939 (11th Cir. 2013)). "[I]n the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990). Such an intent may be inferred from a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Id. (alteration and omission in original) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). "Field preemption reflects a congressional decision to foreclose any state

regulation in the area, even if it is parallel to federal standards." Arizona v. United States, 132 S. Ct. 2492, 2502 (2012).

It is clear that Congress did not intend for the federal government to occupy the field exclusively. Section 6(f) of the ESA provides in pertinent part:

> Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.

16 U.S.C. § 1535(f). The language of 16 U.S.C. § 1535(f) itself allows other governments to participate in the protection of endangered species, although it sets federal law as the minimum standards which may be imposed. Summary judgment is therefore granted in favor of defendants as to this issue.

### iii.    Conflict Pre-emption

Conflict pre-emption arises when "compliance with both federal and state regulations is a physical impossibility." Hillsborough County, 471 U.S. at 713 (quoting Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963)). Plaintiffs argue that CCME Policy 6.1.5 is pre-empted by conflict pre-emption because it is inherently in conflict with the prohibitions and intent of the ESA. (Doc. #87, p. 17.) Specifically, plaintiffs allege conflict because CCME Policy 6.1.5 "stands as an obstacle

to the accomplishment and execution of the full purposes and
objectives of Congress" because it does not require a landowner to
first obtain a FWS ESA § 10 HCP and ITP.  (Doc. #93, pp. 10-12).
Defendants respond that CCME Policy 6.1.5 is not pre-empted by the
ESA because it does not prevent the application of the ESA or
conflict with it.  (Doc. #90, pp. 7-11.)  The Court does not find
a conflict, and therefore finds no pre-emption.

It is clear from the language of the regulations that it is
not a physical impossibility for a landowner to simultaneously
comply with the requirements of CCCM 6.1.5 and the ESA.  To the
contrary, Collier County emphasizes that the landowner must comply
with all federal requirements prior to clearing any land. (See
Doc. #61-3, p. 6); LDC § 10.02.06(A)(1)(a).  Plaintiffs are
essentially arguing that Collier County is required to withhold
issuance of its approval until a landowner complies with the
provisions of the ESA.[5]  The burden of enforcement, however, lies
with federal agencies, not local governments.  Where authorization
is required from multiple agencies before an action can be taken,
nothing in the ESA compels a county to require that the ESA
approvals be obtained first.  Because landowners can, and are
required to, comply with the requirements of CCME Policy 6.1.5 and

---

[5] Plaintiffs unsuccessfully attempted to get the FWS to take
action against agricultural land clearing in NBM prior to the
initiation of this action.  (Doc. #58, p. 16.)

the ESA, the Court finds that CCME Policy 6.1.5 is not less restrictive than the ESA, and is therefore not pre-empted.

Accordingly, as to Count I, defendants' motion to dismiss is granted as to the individual defendants based upon legislative immunity, and is otherwise denied; plaintiffs' motion for summary judgment is denied; and defendants' motion for summary judgment is granted as to all defendants because CCME Policy 6.1.5 is not pre-empted by the ESA.

**(2)   Count II:  ESA Pre-emption of CCME Policy 7.1.2**

**(a)   Dismissal For Failure to State a Claim:**

Defendants assert that Count II, which alleges that CCME Policy 7.1.2 is pre-empted by the ESA, fails to state a claim upon which relief may be granted.  Defendants make the same arguments as with CCME Policy 6.1.5, and plaintiffs have made the same response.

As with Count I, the Court finds that Count II has alleged sufficient facts which make it plausible that this facial pre-emption count states a claim upon which relief may be granted. Therefore, the motion to dismiss Count II on this ground is denied.

**(b)   Dismissal Based on Statute of Limitations, Tenth Amendment, Failure to Join Indispensable Parties, and Legislative Immunity**

Defendants raise the same arguments as to these issues as to Count II as they did regarding Count I, and plaintiffs have made the same responses.  The Court's finding are the same as well.

Accordingly, the portions of the motions to dismiss Count II raising defenses of statute of limitations, Tenth Amendment, and failure to join indispensable parties are denied.  The motion to dismiss the individual Commissioners in their official capacities based upon legislative immunity is granted, and the Commissioners are dismissed from Count II with prejudice.

### (c)  Summary Judgment Regarding Count II

CCME Policy 7.1.2 provides that individual single family residences are exempt from certain preservation requirements set forth in the CCME.   Collier County asserts that it exempts individual single family residences from the requirements of CCME Policy 7.1.2 in order to comply with Florida law.[6]  This exemption, however, does not waive the requirements of the ESA, nor does it excuse a permit holder's failure to comply with state and federal law.  CCME Policy 7.1.2 explicitly requires landowners to obtain any applicable state or federal development orders or permits prior to the commencement of any construction and/or development.  LDC § 10.02.06(A)(1)(a).  Indeed, a property owner that fails to comply with the requirements of LDC § 10.02.06 may be subject to both

---

[6] Collier County asserts that it adopted CCME Policy 7.1.2 to comply with Fla. Stat. § 125.022(4), which provides that "a county may not require as a condition of processing or issuing a development permit that an applicant obtain a permit or approval from any state or federal agency unless the agency has issued a final agency action that denies the federal or state permit before the county action on the local development permit."

monetary and criminal penalties. LDC § 10.02.06(D). The Court holds that CCME Policy 7.1.2 is not less restrictive than the ESA and its implementing regulations. Accordingly, as with the claim in Count I, the Court finds that the CCME Policy 7.1.2 is not pre-empted because of express pre-emption, field pre-emption, or conflict pre-emption.

Accordingly, as to Count II, defendants' motion to dismiss is granted as to the individual defendants based upon legislative immunity, and is otherwise denied; plaintiffs' motion for summary judgment is denied; and defendants' motion for summary judgment is granted as to all defendants because CCME Policy 7.1.2 is not pre-empted by the ESA.

### (3) Count III: Wilson Boulevard Extension

#### (a) Dismissal for Failure to State a Claim

Defendants assert that Count III fails to state a claim upon which relief may be granted. Count III essentially alleges two claims, as is sometimes permitted by Fed. R. Civ. P. 10(b). Count III asserts that certain "regulatory actions" taken by the County with regard to the future extension of Wilson Boulevard are pre-empted by § 6(f) of the ESA. Count III also asserts that those "regulatory actions" constitute an indirect illegal harming and harassing of the Florida panther and RCW, and thus an unlawful taking under § 9 of the ESA. The Court addresses the pre-emption

portion of Count III now, and the taking portion in conjunction with Count VI.

As with Counts I and II, the Court finds that the portion of Count III which alleges pre-emption has alleged sufficient facts which makes it plausible that this facial pre-emption count states a claim upon which relief may be granted. Therefore, the motion to dismiss Count III on this ground is denied.

### (b) Dismissal Based Failure to Join Indispensable Parties and Legislative Immunity

Defendants raise the same arguments regarding failure to join indispensable parties and legislative immunity for Count III as they did regarding Counts I and II, and plaintiffs have made the same responses. The Court's findings are the same in regard to the defense of failure to join indispensable parties and that portion of the motion to dismiss Count III is denied. The motion to dismiss the individual Commissioners in their official capacities based upon legislative immunity, however, is also denied. While it is clear from the face of the Third Amended Complaint that enacting the challenged policies is "quintessentially legislative," Count III alleges a variety of "regulatory actions" as the offending conduct. It is not at all clear that such "regulatory actions" fall within the Commissioners' legislative function, and therefore the motion to dismiss is denied as to the individual commissioners.

### (c)   Summary Judgment Regarding Count III Pre-emption

Plaintiffs assert that the County's foreseeable future regulatory actions to extend Wilson Boulevard without obtaining FWS ESA § 10 HCP and ITP are pre-empted by ESA § 6(f). Plaintiffs assert that all three types of pre-emption are applicable to the Count's future regulatory actions to extend the Wilson Boulevard. In briefing, defendants allege that none of the types of pre-emption apply to the Wilson Boulevard because pre-emption only applies to laws and regulations, and plaintiffs have not identified any laws or regulations that are pre-empted. (Doc. #89, pp. 10-12.) At Oral Argument, defendants again asserted plaintiffs have failed to identify any law or regulation relating to the Wilson Boulevard that could be subject to pre-emption by the ESA. The Court agrees.

Plaintiffs have pointed to a finite number of actions that they contend constitute "regulatory actions" made in implementing the Wilson Boulevard extension — plans, zoning, development agreements, and land purchases. (Doc. #87, pp. 19-20.) Yet, Plaintiffs have failed to identify any law or regulation relating to the proposed Wilson Boulevard extension that could be subject to pre-emption.

Accordingly, as to Count III, defendants' motion to dismiss is denied; plaintiffs' motion for summary judgment is denied; and defendants' motion for summary judgment is granted because the

regulatory actions relating to the extension of Wilson Boulevard are not pre-empted by the ESA.

### (4)  Counts IV and V:  "Take" Claims

#### (a)  Failure to State or Establish a Claim

Defendants seek dismissal and/or summary judgment of Counts IV and V as a matter of law because the Third Amended Complaint and the summary judgment evidence fail to establish a "take" under the ESA.  Defendants assert plaintiffs have not alleged or shown a single fact to establish anything more than hypothetical harm, or identified a single land clearing authorization or single family home permit which was issued and then utilized by the owner in a manner inconsistent with the ESA.  (Doc. #85, pp. 9-11.) Defendants also argue that its regulatory scheme does not *per se* amount to a "take" because the land clearing authorizations and single family home building permits authorize the respective activities only on the condition that the landowner otherwise complies with federal law.  Thus, harm can only result from an intervening independent actor — the landowner. (Doc. #85, pp. 11-14.)  Finally, defendants argue they cannot be liable for these two exemptions because Collier County has no authority to regulate the lands at issue in the manner plaintiffs seek because their requested relief would violate Florida's Right to Farm Act. (Doc. #85, pp. 14-15.)  Plaintiffs oppose all arguments presented by defendants. (Doc. #86.)

Defendants assert that plaintiffs have not pointed to a single agricultural land clearing or single family residence permit that has been issued.  The Court addressed similar arguments in regard to the Court's ripeness analysis, and finds that plaintiffs have sufficiently alleged harm for motion to dismiss purposes.  In their Third Amended Complaint, plaintiffs allege that that agricultural land clearing authorizations and single family residence permits are being issued by the County.[7] (Doc. #81, ¶¶ 115, 154.)  The Court finds these allegations sufficiently allege that the County is currently issuing authorizations and permits pursuant to CCME policies 6.1.5 and 7.1.2.

Defendants next assert that the County's regulatory scheme does not *per se* amount to a "take" because the land clearing authorizations and single family home building permits authorize the respective activities *only* on the condition that the landowner otherwise complies with federal law.  (Doc. #85, pp. 11-14.)  In order for regulatory acts to result in ESA liability, there must be a close connection between the liable actor's conduct and habitat destruction or killing of endangered species.  <u>Aransas Project v. Shaw</u>, 775 F.3d 641, 659 (5th Cir. 2014).  In <u>Sierra</u>

---

[7] Plaintiffs have provided further evidence that the County is currently issuing permits pursuant to CCME Policies 6.1.5 and 7.1.2.  (Docs. #33-1, 34-1.)  These Affidavits, however, are outside of the four corners of the Third Amended Complaint and will not be considered when ruling on the motion to dismiss.

Club v. Yeutter, 926 F.2d 429 (5th Cir. 1991), the court determined that the Forest Service violated Section 9 of the ESA because it permitted excessive timber removal in Texas forests whose trees are home for red-cockaded woodpeckers. Id. at 432-33. In Strahan v. Coxe, 127 F.3d 155 (1st Cir. 1997), the state's licensing of fishermen to use gillnets and lobster traps in certain areas was done with an awareness that right whales could be caught in the devices, and the evidence showed that over fifty percent of right whales showed scars from previous encounters with the devices. Id. at 165. Based on this evidence, the court concluded that the state's licensing of gillnets and lobster pots resulted in a take of right whales in violation of the ESA. Id. The regulations or licensing in both of these cases concerned actions that directly killed or injured species or eliminated their habitat.

Not all regulatory action has such direct consequences. In Loggerhead Turtle v. Cnty. Council of Volusia Cnty., 92 F. Supp. 2d 1296 (M.D. Fla. 2000), the plaintiffs claimed that the County was in violation of Section 9 of the ESA "because the County's *affirmative* acts of adopting and enforcing an ineffective artificial beachfront lighting ordinance [was] a proximate cause of the harm to and mortality of sea turtles." Id. at 1306. The court rejected the plaintiffs' claim because the ordinance at issue did not violate the ESA, permit otherwise unlawful activity, or "license an act in expressly a manner likely to result in an ESA

violation." Id. at 1307.  In rejecting the plaintiffs' claim, the court noted that "Volusia County cannot be made to assume liability for the act of its private citizens merely because it has chosen to adopt regulations to ameliorate sea turtle takings."  Id. at 1308.

Unlike the regulations in Yeutter and Strahan, CCME Policies 6.1.5 and 7.1.2 do not authorize conduct that results in a take of the Florida panther or RCW.   Collier County's land clearing authorizations and single family home building permits simply authorize the clearing and building if the landowner otherwise complies with federal law.  In order for a take to occur, a third party must violate Collier County's regulations and the ESA. Defendants cannot be held liable for such conduct.  As previously stated, plaintiffs essentially want Collier County to enforce the ESA by withholding its approvals until the ESA requirements have been satisfied.   Enforcement of the ESA, however, is the responsibility of federal agencies, not local governments.   The Court finds that defendants have not violated the ESA by adopting and implementing CCME Policies 6.1.5 and 7.1.2.   Accordingly, Counts IV and V are dismissed with prejudice, or alternatively, summary judgment is entered in favor of defendants on these counts.

### (5)  Count VI:  Wilson Boulevard Extension Taking Claim

#### (a)  Dismissal for Failure to State a Claim

Defendants seek to dismiss Count VI because there is no evidence that the County will construct the Wilson Boulevard extension in a manner which is not in compliance with the ESA. Defendants assert that there is no allegation that the time for the County to apply for such permits has arisen, and absent a current obligation to file an HCP and ITP there can be no cause of action.  (Doc. #85, pp. 15.)  The Court disagrees.  Count VI plausibly alleges that the County was obligated to comply with the ESA now with regard to the Wilson Boulevard extension.

#### (b)  Dismissal Based on Failure to Join Indispensable Parties and Legislative Immunity

Defendants raise the same arguments regarding failure to join indispensable parties and legislative immunity for the County Commissioners in their official capacities for Count VI as they did regarding the previous Counts, and plaintiffs have made the same responses.  The Court's findings are the same as its findings in regard to Count III.  Accordingly, the portions of the motions to dismiss Count VI raising defenses of failure to join indispensable parties and legislative immunity are denied.  The Court finds, as it did in Count III, that it is not at all clear that such "regulatory actions" alleged fall within the Commissioners' legislative function.

### (c)   Summary Judgment

The issue in Count VI is whether the time has come for Collier County to apply for a FWS ESA § 10 HCP and ITP.  Plaintiffs argue that it is past time, while defendants argue it is not yet reached that stage.  Plaintiffs argue that "Collier County's foreseeable future regulatory actions to extend Wilson Boulevard in NBM without obtaining a FWS ESA §10 HCP and ITP is a take of Florida panthers and RCWs in violation of ESA §9." (Doc. #87, pp. 24-25.)  Plaintiffs also allege that the regulatory actions are severing Florida panther breeding habitat and passing through occupied RCW cavity trees and foraging habitat.  (Id.)  Defendants represent that the County has every intention of obtaining all necessary permits and approvals prior to initiating the Wilson Boulevard extension, including applying for a FWS ESA § 10 HCP and ITP. (Doc. #89, pp. 17-18; Doc. #90, pp. 23-24.)

Both parties agree that Collier County must obtain a FWS ESA § 10 HCP and ITP prior to extending the Wilson Boulevard, at least in regard to its currently proposed route.  Plaintiffs allege, however, that the County's actions taken thus far require it to obtain a FWS ESA § 10 HCP and ITP.  Plaintiffs allege that the County has taken the following "regulatory actions" toward implementing the Wilson Boulevard extension: adoption of a Long Range Transportation Plan that depicts the extension of Wilson Boulevard through Florida panther and RCW habitat in NBM; enactment

of the Collier Plan NBM Overlay map which depicts the Wilson Boulevard extension through occupied Florida panther and RCW habitat in central NBM; enactment of Collier Plan FLUE stating that the Wilson Boulevard extension should be provided through Section 33, Range 27 East and that lands required for the extension will be dedicated to the County at the time of rezoning; Collier County's official identification and public notice of the Wilson Boulevard extension; advanced right-of-way dedications, Developer Contribution Agreements, zoning approvals, and reservation agreements to obtain the right-of-way for the Wilson Boulevard extension through Florida panther and RCW habitat; Collier County's August 31, 2007 Developer Agreement with Florida Rock Industries, Inc. for the design and construction of phase I of the extension; Collier County Board of Commissioners' approval of the purchase of 302 acres in NBM for accommodating the future Wilson Boulevard extension; and negotiations with the owners of HHH Ranch for right-of-way for the extension. (Doc. #81, ¶ 191.)

The Court finds that these while these "regulatory actions" by the County establish at least the beginnings of its plan for the future extension of the Wilson Boulevard, plaintiffs have not shown that these actions result in a "take" in violation of the ESA.  To the contrary, the County recognizes that it must in fact obtain the necessary permits and approvals prior to initiating construction to extend the Wilson Boulevard.  The Court finds that

defendants have not violated the ESA by their "regulatory actions" thus far in the process of the proposed extension of the Wilson Boulevard.  Accordingly, the Court denies defendants' motion to dismiss Count VI; grants defendants' motion for summary judgment as to Count VI; and denies plaintiffs' motion for summary judgment as to Count VI.

Accordingly, it is now

**ORDERED:**

1.  Plaintiffs' Third Request for Judicial Notice of Adjudicative Facts (Doc. #94) is **GRANTED** to the extent set forth herein.

2.  Defendants' Motion to Dismiss (Doc. #85) is **GRANTED in part and DENIED in part**. Counts I and II are dismissed with prejudice as to the individual county commissioners; Counts IV and V are dismissed with prejudice (alternatively to the grant of summary judgment); the motion is otherwise **DENIED.**

3.  Plaintiffs' Motion for Summary Judgment (Doc. #87) is **DENIED**.

4.  Defendants' Cross-Motion for Summary Judgment (Doc. #90) is **GRANTED** as to all counts since there is neither pre-emption by the Endangered Species Act nor a "take" or attempted take under the Endangered Species Act.

5.   The Clerk shall enter judgment accordingly, terminate all pending motions and deadlines as moot, and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this __8th__ day of April, 2016.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of record